UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
MELISSA TYLER, on behalf       )
of herself and all others      )
similarly situated,            )
                               )
                 Plaintiff,    )
                               )        CIVIL ACTION
           v.                  )        NO. 11-10920-WGY
                               )
MICHAELS STORES, INC.,         )
                               )
                               )
                 Defendant.    )
_____)
```

YOUNG, D.J.                                    December 9, 2015

MEMORANDUM AND ORDER

I.   **INTRODUCTION**

This Court -- with a specific exception -- approved a

settlement agreement of this class action.  See Elec. Clerk's

Notes 5/21/2014, ECF No. 81; Final Approval Order, ECF No. 89.

Thus the Court, consistent with Federal Rule of Civil Procedure

23(e)(2), has already determined that the settlement agreement

is not collusive and is fair, adequate, and reasonable to the

class of consumer-plaintiffs.  There was a sticking point,

however, preventing the Court's complete approval of the

settlement agreement: class counsel's[1] agreed-to request for attorneys' fees and costs in the amount of $425,000.  <u>See</u> Uncontested Mot. Final Approval Proposed Settlement and Award Att'ys' Fees and Costs ("Pls.' Mot."), ECF No. 74; Pls.' Mem. Law Supp. Uncontested Mot. Att'ys' Fees and Costs ("Pls.' Mem."), ECF No. 76.  The Court now turns to that issue.

Class counsel urges this Court to apply Massachusetts law when deciding whether its proffered fees are reasonable.  <u>See</u> Pls.' Mem. 2-3 (discussing Mass. Gen. Laws ch. 93A, § 9(4)).  It notes that federal law governs the question of attorneys' fees only if the settlement is one involving "coupons."  <u>See</u> <u>id.</u> at 15-18.  This one, it asserts, does not.  <u>See</u> <u>id.</u>

Asking the Court for an award of attorneys' fees of $410,994.70, class counsel emphasizes the complexity of the suit and notes that it obtained a "landmark, first-impression ruling" in the Supreme Judicial Court of Massachusetts, and subsequently negotiated a successful settlement on behalf of the Plaintiff class.  <u>Id.</u> at 1-2.  This settlement consisted of $10 and $25 vouchers to Michaels, Inc. ("Michaels"), mailed to class members, with a combined nominal face value of $418,000.  <u>Id.</u> at

---

[1] "Class counsel" refers collectively to two firms: Meiselman, Packman, Nealon, Scialabba & Baker P.C., and Denlea & Carton LLP.  Pls.' Mem. Law Supp. Uncontested Mot. Att'ys' Fees and Costs ("Pls.' Mem.") 1, ECF No. 76

2.  The value of the vouchers actually redeemed by class members was $138,620.00.  Decl. Jane Perelman Redemption Vouchers Distributed Settlement Class Members ("Perelman Decl.") ¶ 6,[2] ECF No. 87.  Class counsel further points out that the requested amount, based on the lodestar calculation, is only 71% of its actual rates, and that its proposed amount is uncontested by the defendant Michaels.  See id.

While the Court agrees with some of class counsel's assertions -- class counsel did obtain an important precedent -- the Court largely disagrees with class counsel's legal arguments (and certain of its factual arguments as well).  Attempting to clarify a tricky area of law, the Court holds as matter of law that because the award to class members consists of non-cash vouchers that have no value to class members unless they transact additional business with Michaels, the award is in the form of "coupons."  Thus federal law, specifically the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4, controls the Court's award of reasonable attorneys' fees.  The Court further holds that CAFA precludes a percentage-

---

[2] As of October 23, 2014, approximately 5,066 vouchers valued at $25.00 (totaling $126,400.00), and approximately 1,222 vouchers valued at $10.00 (totaling $12,220.00) had been redeemed.  See Perelman Decl. ¶ 6.  The total value of the vouchers redeemed thus equals the sum of these two figures, which comes to $138,620.00.

of-recovery award[3] to counsel based on the <u>face value</u> of the coupons awarded to class members, but allows the Court discretion to grant either a percentage-of-recovery award based on the percentage of coupons <u>redeemed</u> by class members or an award based on a lodestar calculation.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs brought this class action lawsuit against Michaels for unjust enrichment and violations of the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93, § 105(a).  Compl. ¶¶ 1-2, 18, ECF No. 1.  Specifically, the Plaintiff class claimed that Michaels' practice of collecting customers' zip codes and addresses during credit card transactions to serve its own interests (<u>i.e.</u>, when the banks did not require such data), was unlawful.  <u>See id.</u> ¶¶ 1-2. After Michaels moved to dismiss, Def.'s Mot. Dismiss, ECF No. 9, a hearing was held, Elec. Clerk's Notes 10/20/2011, and this Court, while granting Michaels' motion, delayed entering a judgment of dismissal for a week's time, observing that, since this case presented an issue of first impression, it would be appropriate for the parties to request that the Court certify legal questions to the Massachusetts Supreme Judicial Court,

---

[3] Meaning an award that is calculated in the same way that a contingency fee would be, as a percentage of the award to class members.

Mem. Order 29-30 n.10, ECF No. 21.  Thus, the Plaintiffs filed a motion for an order to certify certain legal questions, Mot. Order Certify Legal Questions, ECF No. 22, which Michaels opposed, Def.'s Opp'n Pls.' Mot. Certify Legal Questions, ECF No. 23.

This Court granted the Plaintiffs' motion, Order Certification, ECF No. 27, and administratively closed the case, Order Administrative Closure, ECF No. 28.  In March 2013, the Supreme Judicial Court of Massachusetts issued a ruling, Tyler v. Michaels Stores, Inc., 464 Mass. 492 (2013) which held specifically:

> [T]hat a zip code constitutes personal identification information for the purposes of [Mass. Gen. Laws chapter 93A, section 105(a),] . . . that a plaintiff may bring an action for violation . . . absent identity fraud . . . [and] that the term "credit card transaction form" . . . refers equally to electronic and paper transaction forms.

Id. at 506.[4]

The parties then returned to this Court, and the case was administratively re-opened.  See ECF No. 32.  The crux of the allegations against Michaels was that it asked customers for their zip codes as part of credit card transactions to "'reverse

---

[4] Following Tyler, Susan D'Esposito filed a complaint in the United States District Court for the District of Massachusetts, containing analogous allegations against Michaels, and this Court consolidated the two cases.  Order Consolidation, ECF No. 42.

engineer' those customers' addresses using commercially available databases," and then used those addresses to carry out aggressive and unwanted marketing campaigns.  Decl. Todd S. Garber Supp. Pls.' Uncontested Mot. Final Approval Class Action Settlement ("Garber Decl.") ¶ 5, ECF No. 79.  Michaels continually denied the illegality of their actions.  See id. ¶ 17; Pls.' Mem. 6.  After discovery and "consider[ing] [each party's] claims and defenses, [and] the potential for liability," the parties agreed to settle.  Garber Decl. ¶ 19; see Pls.' Mot.

Under the settlement, class members were separated into two subclasses: subclass one and subclass two.[5]  Members of subclass one were to receive vouchers for twenty-five dollars ($25.00), and members of subclass two were to get vouchers for ten dollars ($10.00).  Mot. Prelim. Class Certification, Ex. 2, Settlement Agreement & Release ("Settlement Agreement") § 2.2, ECF No. 64-2.  These vouchers contain several restrictions on their use: they expire ninety days after they are received; class members

---

[5] The class members in subclass one were those "from whom Michaels requested and recorded personal identification information in conjunction with a credit card and/or debit card transaction . . . and [whose] mailing address . . . was solely obtained by a zip code append."  Mot. Prelim. Class Certification, Ex. 2, Settlement Agreement & Release ("Settlement Agreement") § 2.2, ECF No. 64-2.  Those in subclass two were also asked for their zip codes as part of a credit or debit card transaction, but "Michaels obtained [their] mailing address[es] from a source other than a zip code append."  Id.

can only "us[e them] on a single, in-store purchase in
Massachusetts[,]" with "any remaining balance not used in [that]
transaction . . . forfeited" (and clever class members cannot
use them to buy a gift card of equivalent value); and finally,
they are restricted to the physical stores and cannot be used on
Michaels.com.  Id. § 1.3.

Class counsel maintained that there were approximately
15,000 members in subclass one, and 4,300 members in subclass
two.  Pls.' Mem. 1 n.1.  Class counsel sought an award of
attorneys' fees and costs of $425,000 (in cash, not vouchers to
Michaels), which it broke down into $410,994.70 in attorneys'
fees, and $14,005.30 in costs and expenses.  Id. at 2.  Michaels
agreed to pay the $425,000 fee claim in addition to providing
the vouchers.[6]

At the hearing for the final approval of the settlement,
this Court provisionally approved the settlement with the
exception of the award of attorneys' fees.  Elec. Clerk's Notes
5/21/2014, ECF No. 81; Elec. Order, ECF No. 82.  This Court

---

[6] As an aside, cases like this one, where the attorneys'
fees are completely separate from the award to class members,
are not so-called "common fund" cases.  See In re Volkswagen &
Audi Warranty Extension Litig., 692 F.3d 4, 17 (1st Cir. 2012)
("[R]easonable fees class counsel will receive come not out of
the settlement proceeds but are in addition to the settlement
proceeds, rendering the common fund method inapplicable.")
(internal footnote and citation omitted).

stated that it would withhold its determination of attorneys'
fees until the vouchers had expired and it could determine the
redemption rate.  Elec. Clerk's Notes 5/21/2014; Pls.' Supp.
Mem. Law Further Supp. Uncontested Mot. Att'ys' Fees and Costs
("Pls.' Supp. Mem.") 3, ECF No. 88.

The Associate General Counsel of Michaels attested that as
of June 2014, vouchers had been mailed to 18,894 class members:
14,633 in subclass one, and 4,261 in subclass two.  Perelman
Decl. ¶ 3; Pls.' Supp. Mem. 4.  The vouchers expired on
September 30, 2014, by which date 5,056 $25 vouchers had been
redeemed (representing a total dollar amount of $126,400), and
1,222 $10 vouchers had been redeemed (for a dollar amount of
$12,220), thus bringing the total redemption amount -- in retail
value of Michaels' trade goods -- to $138,620.00.[7]  Perelman
Decl. ¶ 6; Pls.' Supp. Mem. 4.  This means that about one in
three vouchers were redeemed.

## III. ANALYSIS

Before issuing any ruling, this Court must determine the
applicable law.  Here, it has not received the benefits of
adversarial briefing on this issue,[8] but has exercised its

---

[7] The financial outlay by Michaels, of course, is less as it
redeemed the vouchers on a retail price basis but incurred only
its wholesale costs to provide the goods redeemed.

[8] This class action settlement agreement, like many others,
contains a provision that bars Michaels from contesting class

independent judgment, as it must when reviewing a class action settlement agreement.  See In re Relafen Antitrust Litig., 360 F. Supp. 2d 166, 192 (D. Mass. 2005) ("Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit.") (internal citations omitted).  For the reasons detailed below, the Court holds that federal law governs its determination of attorneys' fees.

### A.   This Settlement Awards Coupons to Class Members.

District courts, pursuant to Federal Rule of Civil Procedure 23, can approve class action settlements only if they are "'fair, reasonable, and adequate.'"  Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582

---

counsel's proposed fee calculations so long as they do not produce a total greater than that agreed upon.  See Settlement Agreement § 2.6 (describing agreement to attorneys' fees up to $425,000).  The Court agrees with the Seventh Circuit that since "it's in the defendant's interest" to reduce class counsel's attorney's fee request, the defendant generally will not agree to acquiesce in the request for attorneys' fees without obtaining a concomitant "reduction in the part of the settlement that goes to the class members," and as such, this practice might suggest a conflict of interest between class counsel and class members.  Redman v. RadioShack Corp., 768 F.3d 622, 637 (7th Cir. 2014) (Posner, J.) (citing William D. Henderson, Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements, 77 Tulane L. Rev. 813 (2003)).

F.3d 30, 44 (1st Cir. 2009) (quoting Fed. R. Civ. P. 23(e)(2)).

CAFA imposes additional requirements[9] on district courts

evaluating certain proposed class settlements,[10] namely those

that "provide[] for a recovery of coupons to a class member."

28 U.S.C. § 1712.   Given that CAFA imposes more onerous

restrictions on settlements that award class members coupons,[11]

it is unsurprising that class counsel here argues that the

vouchers the proposed settlement agreement awards to class

members are not coupons for purposes of CAFA.   See Pls.' Mem.

---

[9] For a description of these requirements, see infra Part III-B-1 (discussing 28 U.S.C. § 1712(a)-(c), (e)).

[10] As this action was brought "pursuant to Rule 23 of the Federal Rules of Civil Procedure," Compl. ¶ 13, ECF No. 1, it is a "class action" as defined by CAFA.   See 28 U.S.C. § 1711 (defining "'class action' [as] any civil action filed in a district court of the United States under [R]ule 23 of the Federal Rules of Civil Procedure[.]").

[11] There are good reasons for imposing such additional restrictions on coupon settlements.   Courts have recognized that "coupon settlements may incentivize lawyers to 'negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorney's fees.'".   In re HP Inkjet Printer Litig., 716 F.3d 1173, 1177-78 (9th Cir. 2013) (quoting S. Rep. 109-14, at 29-30 (2005); citing Christopher R. Leslie, A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation, 49 UCLA L. Rev. 991, 991 (2002)).
The Court also notes a related problem exists in the appointment of counsel in multidistrict cases, where empowering so-called repeat players might incentivize settlements benefiting the lawyers more than the class members.   See generally Elizabeth Chamblee Burch, Judging Multidistrict Litigation, 90 N.Y.U. L. Rev. 71 (2015).

15-18.  The Court disagrees with this conclusion, and holds as matter of law that these vouchers are coupons.

In deciding what is, and what is not, a "coupon", the Court first looks to the statute's text.  See, e.g., In re BankVest Capital Corp., 360 F.3d 291, 296 (1st Cir. 2004) (internal citation omitted).  CAFA repeatedly references "coupons" in section 1712, but that section does not explain what the term means, and neither does CAFA's "Definitions" section.  See 28 U.S.C. § 1711 (defining several terms but not "coupon" or "coupon settlement"); In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 950 (9th Cir. 2015) ("Congress does not define the ambiguous term 'coupon' within [CAFA]") (internal citation omitted).  The First Circuit has not addressed this what-is-a-coupon issue, so this Court looks to sister circuits for guidance.  They provide incomplete guidance, however, thus the Court charts its own path.

### 1. The Ninth and Seventh Circuits Differ in Their Approaches to Determining Whether a Settlement Agreement Contains Coupons.

The Ninth Circuit and the Seventh Circuit Courts of Appeal have each published opinions in which they determine whether or not a given settlement contains "coupons."  Their approaches are in tension, if not outright conflict.

The Ninth Circuit has adopted a narrow definition of "coupon."  More specifically, that court held that $12 gift

[11]

cards to Walmart are not "coupon[s,]" at least where they are freely transferable, do not "require consumers to spend their own money[,]" and provide class members with "the ability to purchase one of many different types of products." In re Online DVD-Rental Antitrust Litig., 779 F.3d at 951-52.  It reasoned that gift cards are distinct from coupons because Congress regulates gift cards separately, see id. at 952 (referencing legislation that regulates gift cards), although it noted that in an earlier case it had classified "e-credits" as "coupons," due to the fact that they could only be used to buy printers and printer supplies.  Id. (citing In re HP Inkjet Printer Litig., 716 F.3d 1173, 1176 (9th Cir. 2013)).  This Court understands why certain features of the WalMart gift cards are more desirable to class members than the otherwise similar "e-credits," but does not agree that those features make the gift cards any less coupon-like than the e-credits: as will be detailed later in this opinion, the key distinction driving CAFA's skepticism towards coupon payments is between coupons and cash, not between coupons and gift cards.

The Seventh Circuit, in contrast, has adopted a broader definition of "coupon."  While the Ninth Circuit held that certain gift cards are not "coupons," the Seventh Circuit held that $10 vouchers to RadioShack, although capable of being applied to Radioshack's entire product line (which includes some

less-than-$10 items), are nonetheless "coupons" under CAFA. Redman v. RadioShack Corp., 768 F.3d 622, 635-36 (7th Cir. 2014) (Posner, J.), cert. denied sub nom., Nicaj v. Shoe Carnival, Inc., 135 S. Ct. 1429 (2015).

Judge Posner, writing for the Seventh Circuit, rejected class counsel's proposed definition of "coupons" as restricted to certificates providing mere discounts, reasoning that neither CAFA nor common sense provides a compelling reason "for distinguishing among coupons that offer 10 percent, 50 percent, 90 percent, or 100 percent cash savings." Id. at 637.  He explained that CAFA paid special attention to coupon settlements because their nominal value can be much higher than their actual economic value to class members, and thus using nominal values could lead to unreasonably large fees to class counsel.  Id. at 634-35, 637 ("assessing the reasonableness of attorney's fees based on a coupon's nominal face value instead of its true economic value is no less troublesome when the coupon may be exchanged for a full product."); see also In re HP Inkjet Printer Litig., 716 F.3d at 1179 (observing that "where class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult.").  Coupon settlements thus make it more difficult for district courts to assess the size of the benefit to the

[13]

class, and more difficult to detect collusion between defendants and class counsel,[12] to the detriment of class members; this is especially so when (like in the instant case) defendants do not oppose the settlement.  See Redman, 768 F.3d at 637.  Judge Posner's opinion, chock full of analysis though it is, fails to supply a definition for "coupon[,]" except as it holds that a $10 voucher could be one, and that a definition premised on a coupon being merely a discount is untenable.

### 2.   Non-Cash Payments to Class Members Constitute Coupons for Purposes of CAFA.

As it elsewhere calls for a detailed inquiry into the fairness, reasonableness, and adequacy of a class action settlement, see 28 U.S.C. § 1712(e) (describing judicial scrutiny required for coupon settlements), the statute's reference to a "recovery of coupons to a class member" calls for a clear definition of "coupon."

This Court essays such a definition: when class members must transact business with the defendant to obtain the benefit of the settlement, the settlement "provides for a recovery of coupons" under section 1712.  In other words, coupons must be redeemed; conversely, if an award must be redeemed, it is a

---

[12] Of course, the Court does not suggest there was anything like collusion going on in the instant case.  The Court is merely referring to the phenomenon generally, and the arguably skewed incentives that often exist in class action litigation, see supra note 11.

coupon.  See Sarah S. Vance, A Primer on the Class Action

Fairness Act of 2005, 80 Tul. L. Rev. 1617, 1632 (2006) ("CAFA

does not define 'coupon,' but it apparently envisions the award

of something subject to redemption.").[13]  This is consistent with

various dictionaries' approach to defining "coupon": they

generally include a broad definition that requires the coupon-

bearer to go to a particular store to receive an entitlement.[14]

---

[13] Chief Judge Vance is the distinguished chair of the
Judicial Panel on Multidistrict Litigation.  See United States
Judicial Panel on Multidistrict Litigation, Panel Judges,
http://www.jpml.uscourts.gov/content/panel-judges.

[14]  This Court consulted three authoritative sources.
First, it looked to the Oxford English Dictionary, which
provided a broad definition.  See 3 Oxford English Dictionary
1050-51 (2d ed. 1989) ("A form, ticket, part of a printed
advertisement, etc., entitling the holder to a gift or discount,
etc. . . .") (emphasis supplied).  Next, the Court looked to the
American Heritage Dictionary and Merriam Webster's Collegiate
Dictionary, each of which provided a broad definition and an
arguably limited-to-discounts one.  See American Heritage
Dictionary 419 (4th ed. 2000) (defining "coupon" as "A
detachable part, as of a ticket or advertisement, that entitles
the bearer to certain benefits, such as a cash refund or a
gift[,]" and alternatively as something that provides for "a
cash discount.") (emphasis supplied); Merriam-Webster's
Collegiate Dictionary 286-87 (11th ed. 2003) (defining "coupon"
as "a form surrendered in order to obtain an article, service,
or accommodation: as . . . one of a series of attached tickets
or certificates often to be detached and presented as needed"
but also as something that is used "to obtain a discount on
merchandise or services[.]") (emphasis supplied).  All three of
these dictionaries (and the editions cited herein) have been
cited as authorities by courts higher than this one.  See, e.g.,
MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 225
(1994) (citing Oxford English Dictionary); Piccone v. Bartels,
785 F.3d 766, 772 (1st Cir. 2015) (citing both Oxford English
Dictionary and Merriam-Webster's Collegiate Dictionary);

This Court's broad definition is also consistent with the
Congressional Committee's report on CAFA and its discussion of
coupons.[15]

This Court's approach is consistent with that of the
Seventh Circuit insofar as they both reject a distinction
between full-value "vouchers" and less-than-full-value (or,
equivalently, discount) "coupons".[16]   In fact, the main thrust of
CAFA's addition of section 1712 was to ensure that district

---

Ruksznis v. Argonaut Ins. Co., 774 F.3d 784, 788 (1st Cir. 2014)
(citing American Heritage Dictionary).
         Although some of the dictionaries cited also include a
separate definition that is limited to providing discounts, in
none of the dictionaries consulted was that the only or most-
used definition.

         [15] The Senate Judiciary Committee's Report on CAFA seems to
assume a broad definition of "coupon" as it inveighs against
them: "These settlements include many so-called 'coupon
settlements' in which class members receive nothing more than
promotional coupons to purchase more products from the
defendants."   S. Rep. No. 109-14 ("Committee Report") at 15
(2005); see also id. at 16 (referring to coupons as "a
promotional opportunity").
         Many of the disparaging references to coupons in the report
reflect an empirical prediction that the redemption rate will be
low, for a variety of reasons: the low dollar amounts involved;
the hassle; the onerous conditions placed on redemption, such as
expiration dates, restrictions on purchases, aggregating with
other discounts; and because the class members do not want to
conduct any more business with the defendants.   See id. at 16-
17.

         [16] Under the Court's reasoning, the gift cards at issue in
In re Online DVD-Rental Antitrust Litig. would be coupons,
contrary to the Ninth Circuit's holding.   See 779 F.3d at 949-
52.

courts closely scrutinized a particular type of class action settlement: those where class counsel receives cash, yet class members receive non-cash compensation that can only be spent at the defendant-business.[17]  As the vouchers here must be redeemed at Michaels, they are "coupons" under CAFA.

**B.   Class Counsel in this Case Is Entitled to Reasonable Attorneys' Fees Calculated by the Court Using the Lodestar Method.**

Having determined that the settlement at issue contains "coupons," the Court now decides the appropriate method for calculating attorneys' fees in this case, and then uses that method to award class counsel fees and costs for its work.

**1.   Federal Law Governs this Court's Analysis.**

As this is a settlement that provides class members with coupons, CAFA explicitly regulates how this Court may award attorneys' fees.  See 28 U.S.C. § 1712 (a)-(c).  In doing so, CAFA pre-empts any contrary Massachusetts' law that would otherwise govern this Court's determination of reasonableness of

---

[17] The Judiciary Committee's Report on CAFA explicitly contrasts coupons with cash, for example when lamenting that class members collectively received "coupons for $1 off every subsequent $5 purchase at [defendant-restaurant, while] . . . . All [of the] cash from the settlement goes to the lawyers." Committee Report at 16; see also, e.g., id. at 18 (stating "all of the case paid in this state court-approved settlement went to lawyers"); id. (noting that in a different case "only the lawyers received cash payments); id. at 19 (again describing an approved settlement agreement where "[o]nly the lawyers are receiving cash").

a settlement involving a state law cause of action.[18]  See, e.g., In re Sw. Airlines Voucher Litig., 799 F.3d 701, 705-710 (7th Cir. 2015) (applying CAFA's section regulating attorneys' fees coupon in coupon settlements where state law breach-of-contract claims were basis of the class action); In re HP Inkjet Printer Litig., 716 F.3d 1173, 1176, 1178 (9th Cir. 2013) (same); cf. Vaughn R. Walker & Ben Horwich, The Ethical Imperative of A Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases, 18 Geo. J. Legal Ethics 1453, 1473 (2005) ("CAFA's reform of the fee award process is confined to so-called 'coupon settlements.'").

---

[18] This is so despite the fact that "the issue of attorneys' fees . . . [is] substantive and not procedural, and so state-law principles normally govern the award of fees." In re Volkswagen & Audi Warranty Extension Litig., 692 F.3d at 15 (internal citation omitted); see also Diaz v. Jiten Hotel Mgmt., Inc., 741 F.3d 170, 178 (1st Cir. 2013) ("Because [the plaintiff] prevailed only under Massachusetts law, Massachusetts law governs our analysis [of attorneys' fees.") (internal citation omitted). In re Volkswagen is not to the contrary: there, the First Circuit reversed a trial court that had applied federal law in calculating attorneys' fees, rejecting both of class counsel's arguments in defense of the trial court's decision, which were that "Rule 23(h)(3) . . . provides a basis for federal law governing the award of attorneys' fees; and second, in a qualitatively different argument, that federal courts' inherent equitable powers provide a basis for applying federal-law principles to the award of attorneys' fees." 692 F.3d at 15.  Here, in contrast, the Court is acting pursuant to federal legislation.

Here, Michaels wants to buy res judicata[19] -- it wants to obtain a global settlement and preclude future lawsuits by various individuals over its practice[20] -- and wants to do so while ensuring more customers for itself.  Class counsel, in negotiating with Michaels, has ensured itself cash payment, while accepting payment in kind for its clients, the class members.  There is nothing inherently wrong with this, but it does trigger enhanced scrutiny as a coupon settlement under CAFA.

This scrutiny comes in two flavors.  The first ensures thoroughness: this Court "may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members."  28 U.S.C. § 1712(e) (emphasis supplied).  This requirement is not at issue here.[21]  The second aims for

---

[19] See William B. Rubenstein, Why Enable Litigation?: A Positive Externalities Theory of the Small Claims Class Action, 74 UMKC L. Rev. 709, 721 (2006) (noting that lawsuits are transactions "in which res judicata is bought and sold.")

[20] This preclusion of class members who have failed to opt out is one particularly controversial feature of the modern class action.  It has led a commentator to advocate for reconsidering opt-out provisions, arguing that, in light of the conflict-of-interest between class counsel and non-named class members, class members' silence should not indicate their consent.  See generally Debra Lyn Bassett, Class Action Silence, 94 B.U. L. Rev. 1781 (2014).

[21] The Court held the requisite hearing, see Elec. Clerk's Notes 5/21/2014, ECF No. 81, and made the requisite written

proportionality between class counsel's attorneys' fees and the award to the class, see id. § 1712(a), and reasonableness of the fees, see id. § 1712 (b), although how CAFA goes about achieving this is sufficiently murky to have produced a circuit split.

### 2. This Court Has Discretion under CAFA to Choose Between Two Methods of Calculating Attorneys' Fees.

Class counsel requests $410,994.70 in attorneys' fees, basing its request on a modified lodestar calculation using counsel's customary hourly rates and time records.  See Pls.' Mem. 1-2.  The lodestar method involves multiplying the number of hours counsel reasonably expended on litigating a claim by a rate that is determined based on counsel's skill and experience. See, e.g., Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992) (describing method) (internal citations omitted).  In determining whether to award counsel its requested fee award, the Court must first determine whether the lodestar method is an appropriate means of calculating it.  See In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d

---

findings, see Final Approval Order, ECF No. 89.  While imposing an in-writing requirement, section 1712(e) does not appear to change this Court's traditional inquiry under Federal Rule of Civil Procedure 23 (as its language mirrors that found in the Rule), which is whether a proposed class action settlement is "'fair, reasonable, and adequate,' or (in shorthand), 'reasonable.'"  Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 44 (1st Cir. 2009) (quoting Fed. R. Civ. P. 23(e)(2)).

295, 304 (1st Cir. 1995) ("The issue of whether a district court

may use a given methodology in structuring an award of

attorneys' fees is one of law[.]").

CAFA's section concerning coupon settlements contains

three subsections that control the Court's assessment of class

counsel's request for attorneys' fees.  The relevant provisions

are as follows:

> (a)  Contingent fees in coupon settlements.  If a
> proposed settlement in a class action provides for a
> recovery of coupons to a class member, the portion of
> any attorney's fee award to class counsel that is
> attributable to the award of the coupons shall be
> based on the value to class members of the coupons
> that are redeemed.
>
> (b)  Other attorney's fee awards in coupon
> settlements.
>
>     (1)  In general.  If a proposed settlement in a
> class action provides for a recovery of coupons to
> class members, and a portion of the recovery of the
> coupons is not used to determine the attorney's fee to
> be paid to class counsel, any attorney's fee award
> shall be based upon the amount of time class counsel
> reasonably expended working on the action.
>
>     (2)  Court approval.  Any attorney's fee under
> this subsection shall be subject to approval by the
> court and shall include an appropriate attorney's fee,
> if any, for obtaining equitable relief, including an
> injunction, if applicable. Nothing in this subsection
> shall be construed to prohibit application of a
> lodestar with a multiplier method of determining
> attorney's fees.
>
> (c)  Attorney's fee awards calculated on a mixed basis
>      in coupon settlements.  If a proposed settlement
> in a class action provides for an award of coupons to
> class members and also provides for equitable relief,
> including injunctive relief--

(1)  that portion of the attorney's fee to be
paid to class counsel that is based upon a portion of
the recovery of the coupons shall be calculated in
accordance with subsection (a); and

(2)  that portion of the attorney's fee to be
paid to class counsel that is not based upon a portion
of the recovery of the coupons shall be calculated in
accordance with subsection (b).

28 U.S.C. § 1712.  Interpreting the statute so that subsections

(a), (b), and (c) work in tandem is difficult if not

impossible.[22]

Subsection (b) allows use of the lodestar method when class

members receive coupons, provided that a "portion of the

recovery of the coupons is not used to determine the attorney's

fee to be paid to class counsel[.]"  28 U.S.C. § 1712(b).  This

latter clause means one of two things.  First, it could be that,

as the Ninth Circuit Court of Appeals held, subsection (b)

applies only to those settlements that involve some form of

recovery to class members in addition to coupons (meaning

injunctive or equitable relief).  See In re HP Inkjet Printer

Litig., 716 F.3d at 1183-84.  That is, if a settlement provides

only for coupon payments, then subsection (a), and only

---

[22] Section 1712 is far from a model of legislative
draftsmanship.  See, e.g., In re HP Inkjet Printer Litig., 716
F.3d at 1181 ("Both the majority of our panel and our dissenting
colleague agree that [section 1712 of] CAFA is poorly
drafted.").  The Court will try to best effectuate the words and
purpose of the statute.

subsection (a), will govern: courts would be obligated to award
fees based on a percentage-of-recovery method, using the amount
of coupons redeemed as the relevant amount of recovery.
Alternatively, it could be that, as the Seventh Circuit held,
subsection (b) applies to all class actions settlements
involving coupon payments.  See In re Sw. Airlines Voucher
Litig., 799 F.3d 701, 709 (7th Cir. 2015) (citing In re HP
Inkjet Printer Litig., 716 F.3d at 1192-93 (Berzon, J.,
dissenting)).  Under this interpretation, district courts have a
choice when awarding attorneys' fees in coupon settlements --
courts can use the percentage-of-recovery method, but then, per
subsection(a), they must use the amount of coupons redeemed (not
the coupons' nominal value), or they can use the lodestar
method, which subsection (b) allows explicitly, see 28 U.S.C. §
1712(b)(2) ("Nothing in this subsection shall be construed to
prohibit application of a lodestar with a multiplier method of
determining attorney's fees.")

   The Ninth Circuit, over a dissent, adopted the first
approach detailed above, interpreting the statute such that
subsection (b) applies only to settlements that provide for both
coupon and non-coupon relief (i.e., equitable or injunctive
relief).  See In re HP Inkjet Printer Litig., 716 F.3d at 1183-
84.  Thus the Ninth Circuit reversed a lower court's calculation
of fees (in a settlement agreement awarding coupon payments)

[23]

that was based on the lodestar method.  See id. at 1186-87.  It explained that, under its reading, each subsection serves a unique function.  See In re HP Inkjet Printer Litig., 716 F.3d at 1184.  Subsection (a) (in that court's view) mandates a contingency-fee calculation for awarding attorney's fees in exclusively-coupon settlements, while subsection (b) allows a lodestar calculation for the non-coupon portion of a settlement. See id. at 1184-85.  Subsection (c) unites them by providing that when a settlement is mixed, the portion of the award that is due to a coupon settlement is calculated in accordance with subsection (a)'s command, while the non-coupon part of the award "'shall be calculated in accordance with subsection (b).'"  Id. at 1185 n.16 (quoting 28 U.S.C. § 1712(c)(2)).

Judge Berzon dissented, arguing that the titles of the two subsections ("Contingent fees in coupon settlements" and "Other attorney's fee awards in coupon settlements") demonstrate that subsections (a) and (b) create a "dichotomy . . . between two approaches to awarding attorney's fees in coupon settlements [and] not . . . between two types of class relief[.]"  Id. at 1191-92 (Berzon, J., dissenting).  (The two "approaches" are the traditional contingency-fee calculation of subsection (a), and the lodestar method of subsection (b), while the two "types of class relief" are coupon-only settlements and settlements with both a coupon component and an injunctive one.)

[24]

Under Judge Berzon's reading, CAFA's restriction, in subsection (a), on attorney fee calculations when there is a coupon settlement only limits "the district court's method of calculating percentage-of-recovery fees, should it choose that approach."  Id. at 1187.[23]  Thus if a district court calculates fees based on the value of coupons awarded to class members, it, pursuant to subsection (a), "shall" base it "on the value to class members of the coupons that are redeemed[,]" as opposed to the nominal value of the coupons, see id. at 1194 (quoting 28 U.S.C. § 1712(a)) (emphasis supplied); otherwise, the district court retains its usual discretion to award fees based on the lodestar method, id. at 1196.  In other words, subsection (a) should be read narrowly: its mandate only applies to "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons[.]"  28 U.S.C. § 1712(a).  Alternatively, subsection (b) applies when a "portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel" and provides that in those cases "any attorney's fee award shall be based upon [the

---

[23] The district court there had "used its approximate valuation of the coupon and injunctive relief "only as a cross-check of the lodestar amount, reject[ing] the idea of a straight percentage recovery because of its uncertainty as to the valuation of the settlement."  In re HP Inkjet Printer Litig., 716 F.3d at 1189 (internal citation omitted).

lodestar method.]"   28 U.S.C. § 1712(b)(1) (emphasis supplied);

cf. In re HP Inkjet Printer Litig., 716 F.3d at 1193-94

(emphasizing use of "portion").[24]

     The Seventh Circuit recently followed Judge Berzon's

dissent.   See In re Sw. Airlines Voucher Litig., 799 F.3d 701,

707 (7th Cir. 2015).   While acknowledging that subsection (a),

when read in isolation, imposes a mandate on district courts to

use the redeemed-coupon rate as the basis for attorney's fee

awards, that court held that when read in context of the entire

section, "[s]ubsections (a) and (b) . . . fit together to force

a choice between the lodestar method and a percentage of coupons

redeemed."   Id. at 709 (citing In re HP Inkjet Printer Litig.,

716 F.3d at 1192-93 (Berzon, J., dissenting)).   That is,

subsection (a) is only triggered where a district court chooses

to award a percentage-of-recovery attorneys' fee award.   For the

Seventh Circuit, Judge Berzon's interpretation made subsections

(a), (b), and (c) fit together:

> Subsection (a) prohibits basing a percentage-of-
> recovery fee on the face value of all coupons made
> available.   Subsection (b) says that lodestar is the
> only permissible alternative to percentage-of-coupons-
> used.   And subsection (c) allows, though does not
> require, a blend of the two methods when a coupon

---

     [24] In reading (a) as imposing a mandatory requirement on all
coupon-only settlements, the majority's interpretation ignores
section (a)'s limiting us of "portion," the dissent argues, as
subsection (c) explicitly regulates settlements calculated on a
mixed basis.   See In re HP Inkjet Printer Litig., 716 F.3d at
1193-94.

> settlement also provides some equitable or cash
> relief.

Id. at 710 (internal citation omitted).

Judge Berzon and the Seventh Circuit's interpretation of these provisions in CAFA is more convincing to this Court than the Ninth Circuit majority's for two reasons.  First, the titles of the subsections indicate that they are meant to apply to different methods of calculation.  Cf. Plumley v. S. Container, Inc., 303 F.3d 364, 369, 371 (1st Cir. 2002) (noting that "courts must look first to [a statute's] language and structure.") (emphasis supplied) (internal citations omitted). The titles, in order from (a) to (c), read: "Contingent fees in coupon settlements"; "Other attorney's fee awards in coupon settlements"; and "Attorney's fee awards calculated on a mixed basis in coupon settlements[.]"  28 U.S.C. § 1712.  Second, the Ninth Circuit's interpretation of subsection (a) ignores the phrase "attributable to" and the word "portion", which together limit subsection (a)'s scope to "the portion of any attorney's fees to class counsel that is attributable to the award of coupons[.]"  28 U.S.C. § 1712(a).  To see the force of the statute's limiting words, contrast the statute's actual wording with a hypothetical statute that stated "when a proposed settlement in a class action provides for coupon payments to

class members, the attorney's fee shall be based on the value to class members of the coupons that are redeemed."

Here, then, if the Court were to award class counsel fees based on a percentage-of-recovery method, subsection (a) would govern, and would require the Court to use "the value to class members of the coupons that are redeemed."  28 U.S.C. § 1712(a). Alternatively, if the Court were to decline to use that method, subsection (b) would apply, dictating that "any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action."  Id. § 1712(b).

To summarize: this Court holds that when a class settlement involves the payment of coupons to class members, subsection (a) precludes the Court from awarding attorneys' fees based on the nominal value to the class of the coupons, but that, even with coupon-only settlements, it does retain discretion to choose between awarding fees among two allowable methodologies: using a percentage (a "portion") of the redeemed coupons, as provided by subsection (a), or employing the lodestar amount as provided by subsection (b).[25]

_____

[25] The Court notes that its interpretation renders the statute's use of the qualifying clause in subsection (b), limiting subsection (b)'s scope to when "a portion of the recovery of the coupons is not used to determine the attorney's fee[,]" at the very least confusing, because the "portion" could be nothing (as in the instant case), and a "portion" is normally at least something.  This oddity, however, is the lesser of two evils, as the competing interpretation of section 1712 raises

### 3.   The Lodestar Method is Appropriate in this Case.

Here, class counsel has requested $410,994.70 in attorneys' fees,[26] and justifies its request by referencing the lodestar method, as well as by discussing several factors outlined by Massachusetts courts as important in determining the reasonableness of requested attorneys' fees.  See Pls.' Mem. 10-15; Fairness Hearing Tr. May 21, 2014, 17-18, ECF No. 85.

CAFA regulates the Court's calculation of attorneys' fees. As the Court reads section 1712, it vests the Court with the discretion to choose between using a percentage-of-coupons-redeemed method, or the lodestar method.  See 28 U.S.C. § 1712 (a)-(b).  The Court chooses to employ the latter method in this particular case because using the percentage-of-recovery method would result in a substantial reduction of attorneys' fees from what class counsel has requested,[27] which is unwarranted here for two reasons.

---

more serious difficulties, namely contradicting the structure of the section as evidenced by each subsection's title, and ignoring the limiting force of "portion," see supra note 24.

[26] The Court finds its request for costs to be appropriate, and grants it in full.

[27] Thirty-three percent of the redeemed-amount is $45,744.60, and the Court would be hesitant to go too much higher than that percentage.  See In re Relafen Antitrust Litig., 231 F.R.D. 52, 81 (D. Mass. 2005) (noting that thirty-three and one-third percentage is a high percentage [to use to award attorneys' fees] for a large settlement fund.") (collecting cases).

First, class counsel vindicated the important public policy goals of Massachusetts' consumer protection statute, see Barron v. Fid. Magellan Fund, 57 Mass. App. Ct. 507, 517 (2003) (noting "the [Massachusetts] Legislature's manifest purpose of deterring misconduct [in] affording both private and public plaintiffs who succeed in proving violations of [chapter 93A] reimbursement for their legal services and costs.") (internal quotation marks omitted).  Second, and most importantly, they obtained binding precedent from the Supreme Judicial Court that will influence conduct far beyond that of Michaels.  Cf. Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008) (noting that a trial court may increase an award of attorneys' fees "based on any of several different factors, including the results obtained") (internal citation omitted).

The Court emphasizes that, under its interpretation of CAFA, the choice of how to calculate attorneys' fee awards in coupon-only settlements such as this is a matter left to the Court's principled discretion.  Given the hostility to disproportionately large fee awards to class counsel evident in the legislative history -- at least insofar as fees generated from obtaining coupon settlements were concerned[28] -- counsel may

---

[28] For a discussion of that legislative history, see supra notes 15 and 17.

reasonably expect that this Court will generally award
attorneys' fees based on a percentage of the actual value of the
coupons redeemed by class members, absent the groundbreaking
nature of this case.[29]

---

[29] Candor compels the Court to confess that, when awarding
attorneys' fees in this case, it contemplated -- but rejected as
wholly inappropriate -- an additional consideration: the views
of the Judicial Panel on Multidistrict Litigation (the "Panel").

    This is not an Multidistrict Litigation ("MDL") case.  Why
do the non-precedential views of that Panel matter in the least?
Here's why:

    Notwithstanding the rhetoric, the civil caseload of the
district courts has remained largely static for the last twenty-
nine years.  See Patricia W. Hatamyar Moore, The Civil Caseload
of the Federal District Courts, 2015 U. Ill. L. Rev. 1177, 1235
(2015) ("[T]he number of new civil cases filed since 1986 has
increased a mere 9%.  [T]he number of weighted civil filings per
authorized district court judge has increased only 6% since
1986.").  What has changed are the nation's demographics, the
rate and location of case filings, and the virtual abandonment
of the civil jury trial due largely to "massive campaigns to
reduce the legal obligations of business and to curtail legal
remedies for others."  Marc Galanter, The Hundred-Year Decline
of Trials and the Thirty Years War, 57 Stan. L. Rev. 1255, 1272
(2005) (internal footnote omitted).  It is indicative of today's
institutional thought in the federal judiciary that the 2015
edition of the Strategic Plan for the Federal Judiciary nowhere
in its twenty-two pages mentions the word "trial" or the phrase
"jury trial."  See Judicial Conference of the United States,
Strategic Plan for the Federal Judiciary (Sept. 2015),
http://www.uscourts.gov/statistics-reports/strategic-plan-
federal-judiciary.  These changes, the Court suspects, are the
real driver behind what the Strategic Plan characterizes as
"pockets of delay [that] persist in the courts[,]" and the
"number of courts with persistent and significant backlogs[.]"
Id. at 5.

    To address this issue of delay, the Judicial Conference
lobbies (largely unsuccessfully) for additional authorized
district court judgeships for those courts with exceptionally
heavy case filings and paradoxically seeks to reduce through
attrition judicial officers in districts where case filings are
low.  See, e.g., In re Nexium (Esomeprazole) Antitrust Litig.,

---

309 F.R.D. 107, 135 n.41 (D. Mass. 2015), as amended (Aug. 7, 2015) (describing Conference's recommendation to the President and the Senate that the District of Wyoming's next vacant judgeship should remain vacant).

As an aside, the Judicial Conference's argument is an example of "market thinking."  As Harvard professor Michael Sandel has perceptively remarked, "[i]n the past three decades, market thinking has crowded out moral and civic arguments, as if markets and market solutions were neutral ways by which to answer these controversial questions without having to debate them. That's thinking that we need to lean against."  Alex Kingsbury, Political Debate on a Stadium-Scale, The Boston Globe (Sept. 20, 2015), https://www.bostonglobe.com/ideas/2015/09/19/political-debate-stadium-scale/c7NPuXGJK69uXpHOuzjNQO/story.html.  It is simply not acceptable to say that the present level of judicial resources is "good enough."  The interests of justice for all our people require a major reduction in the present state of delay in the federal district courts.  Simply put, we need more judges.  But let that bide.

Returning to the Judicial Conference's caseload-based lobbying: it interacts importantly with the Judicial Panel on Multidistrict Litigation.  Today the latter controls the case assignment of more than 33% of the nation's federal civil caseload.  In re Nexium (Esomeprazole) Antitrust Litig., 309 F.R.D. at 135 n.41 (citing Jaime L. Dodge, Wrangling the Beast, 99 Judicature 32 (2015)); Thomas Metzloff, The MDL Vortex Revisited, 99 Judicature 36 (2015)).  As cases transferred by the Panel to a remote court count as case filings in the transferee court, they tend to immunize that court against the potential loss of a judgeship.

Unlike the typical "blind draw" provision to allocate cases among the judges in a particular district, see, e.g., LR, D. Mass. 40.1(A)(3) (describing assignment of civil cases "by lot among the judges of the court"), the Panel makes its assignment to a particular judge in a particular district court.  As might be expected, this results in intense forum shopping before the Panel as MDL treatment consolidates cases for pretrial proceedings in a particular forum from which they rarely, if ever, return.  See In re TJX Companies Retail Sec. Breach Litig., 584 F. Supp. 2d 395, 405 (D. Mass. 2008) (quoting Samuel Issacharoff as saying "Multi-district litigation is like the old Roach Motel ad: 'Roaches [the transferred cases] check in -- but they don't check out.'") (alterations in original)).  It naturally follows that, as the power of the Panel over the nation's civil caseload increases, so too does scrutiny by the

legal profession.  See generally, e.g., Elizabeth Chamblee
Burch, Judging Multidistrict Litigation, Presentations and
Speeches Paper 39 (2015),
http://digitalcommons.law.uga.edu/fac_presp/39.  Today, at least
some counsel (albeit those representing a pro-business advocacy
group) argue that the Panel's choice ought rest on a district
judge's strict scrutiny of claims for attorneys' fees in class
action settlements.  See Brief for Competitive Enterprise
Institute's Center for Class Action Fairness as Amicus Curiae,
In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and
Prods. Liability Litig., MDL No. 2672 (October 20, 2015), ECF
No. 362.

       Courts have long wrestled with forum shopping.  What about
forum selling?  A brilliant new article emphatically makes the
point that the individual district courts themselves are
proactive players in case administration issues.  See Daniel
Klerman & Greg Reilly, Forum Selling, S. Cal. L. Rev.
(forthcoming), available at http://ssrn.com/abstract=2538857
(detailing the successful court-wide practices that made the
Eastern District of Texas the leading patent trial court in the
nation -- and the legal distortions that accompanied these
practices).  Interestingly, the Judicial Conference has rewarded
the Eastern District of Texas by seeking an additional judgeship
for it.  See Report of the Proceedings of the Judicial
Conference of the United States 18-19 (March 10, 2015)
(recommending that the Eastern District of Texas receive two
additional permanent Article III judgeships as well as a
conversion of one of its currently temporary judgeships to
permanent status).

       The general point made in Forum Selling, however, is
applicable to district courts generally: all are living
organizations, charged with serving their districts and the
nation to the best of their ability and all, to a greater or
lesser degree, are proactive in this service.  One thinks
immediately of the "rocket docket" of the Eastern District of
Virginia, with its own strengths and weaknesses.

       None will go quietly into decline, voluntarily acceding to
losing a judge with its concomitant negative impact on the
direct democracy of the jury system -- courts are made up of
judges, who are all too human, and subject to hidden biases like
anyone else.  See, e.g., Daniel J. Knudsen, Institutional Stress
and the Federal District Courts: Judicial Emergencies, Vertical
Norms, and Pretrial Dismissals, 2014 Utah L. Rev. 187, 212
(2014) ("[J]udicial emergencies in the federal circuit courts
have a statistically robust effect on judicial decision making
in the federal district courts.  In particular, an emergency in

### 4.   Class Counsel's Proposed Lodestar Rates Are Unreasonably High.

The lodestar amount is the appropriate method under federal law.  Unlike with respect to percentage-of-recovery calculations, CAFA offers no mandate on lodestar calculations other than instructing courts to base them "upon the amount of time class counsel reasonably expended working on the action." 28 U.S.C. § 1712(b)(1).  The Court thus holds that it retains its usual discretion, meaning it "may adjust the lodestar amount in response to factors of each particular case," while recognizing that "the lodestar figure does presumptively represent a reasonable award of fees."  Ins. Recovery Grp., Inc. v. Connolly, 95 F. Supp. 3d 73, 79 (D. Mass. 2015) (internal citation omitted), appeal dismissed (May 14, 2015).  The Court, as will be explained below, reduces class counsel's requested fee to the amount of $312,895.00.

---

its corresponding federal circuit court makes it statistically more likely that cases will be disposed of through pretrial motions in federal district court. . . . [T]his effect is actually occurring robustly in larger district courts.").

Yet how is a court to increase its caseload and avoid the Judicial Conference axe?  Simply helping out other courts as a visiting judge won't work, as the prime determinant is a court's own caseload.  By contrast, assignment as an MDL judge has a direct beneficial effect on a court's perceived workload, as the transferred cases get full value in the transferee court.

So it is that, were the Judicial Panel on Multidistrict Litigation to begin assigning cases in any way based on a judge's hostility to attorneys' fees in class action cases, it would introduce an unfortunate and unwarranted distortion into the judicial law-explaining role.

As explained in its memorandum, class counsel believes that attorneys' fees in the amount of $410,994.70 are reasonable. Pls.' Mem. 2.  In reaching that amount, counsel reduced in part their proposed lodestar amount,[30] which was arrived at by multiplying the time spent on this action by the hourly rate for each attorney who worked on it.  Id. at 5; see Miles v. Sampson, 675 F.2d 5, 8 (1st Cir. 1982) (describing this method as the lodestar method).  Class counsel states that it spent 893.90 hours on this lawsuit,[31] and that its lodestar amounts were $650

---

[30] Class counsel argues that its requested amount constitutes only 71% of what the award would be if it were based on its actual hourly rate, see Pls.' Mem. 2, but the fact that class counsel offered, as a comparison to its proposed fee award, a nominal rate that would have produced an even higher fee award, does not convince the Court of the proposed award's reasonableness.

[31] Class counsel seems to have made an arithmetic error somewhere in their lodestar calculation.  Even using their figures, it is not mathematically possible that 893.9 hours worked yields a lodestar amount of $575,095.50.  It appears that class counsel included the hours worked by the paralegals when performing the lodestar calculation, thus bringing the total hours spent on this action to 916.35, as this yields a dollar amount of $575,095.50.  See Garber Decl., Ex. 2, Meiselman Time Sheets, ECF No. 79-2; see also Decl. Jeffrey Carton ("Carton Decl."), ECF No. 74-1, Ex. 2, Carton & Berg Time Sheets ("Carton Time Sheets"), ECF No. 74-3.  For reference, see the table below (which combines Carton's work for each of the two law firms):

| NAME | POSITION | HOURS | HOURLY RATE | TOTAL |
|------|----------|-------|-------------|-------|
| Blankinship | Partner | 351.10 | $650 | $228,215.00 |
| Garber | Partner | 104.70 | $650 | $68,055.00 |
| Frei-Pearson | Partner | 77.70 | $650 | $50,505.00 |
| Carton | Partner | 148.75 | $650 | $96,687.50 |
| Becker | Associate | 19.90 | $250 | $4,975.00 |

per hour for partners, $250 per hour for associates, and $90 per hour for paralegals.  See Garber Decl. ¶ 34; Decl. Jeffrey Carton Supp. Pls.' Uncontested Mot. Final Approval Class Action Settlement ("Carton Decl.") ¶ 18, ECF No. 74-1.  These rates, class counsel argues, are reasonable, as they are on par with rates charged at other law firms in Boston.  Pls.' Mem. 9 (citing Brandon Gee, The Going Rate(s), Lawyers Weekly (Oct. 11, 2013), http://masslawyersweekly.com/2013/10/11/the-going-rates/ (The average hourly rate of a partner in Boston is $598.69, and the average rate of an associate is $386.21)).  Although class counsel did not request the full amount of attorneys' fees that these proffered rates produce, the Court will still evaluate its rates, and independently determine reasonable rates to be awarded to class counsel in this case.

   The Court is aware that while partners may ostensibly bill a certain dollar amount, that is not, in fact, necessarily the amount they expect to be paid.  As previously explained by this Court:

   [T]he gap between billing rates and court awarded rates is more apparent than real. Billing rates are just that — an initial demand for payment. They may well not reflect the actual "yield" from the bills

| | | | | |
|---|---|---|---|---|
| Berg | Partner | 191.75 | $650 | $124,637.50 |
| Ronci | Paralegal | 12.05 | $90 | $1,084.50 |
| Burke | Paralegal | 3.60 | $90 | $324.00 |
| Benezra | Paralegal | 6.80 | $90 | $612.00 |
| | | **916.35** | | **$575,095.50** |

[ 36 ]

sent out. It has been [this Court's] experience as an
intern, associate, and partner in big New York and
Boston law firms (albeit years ago) that well run
firms keep very close tabs on this "yield," i.e., the
spread between the hours billed and the comparable
amounts clients are actually willing to pay.
Naturally, firms keep their "yield" data closely
guarded and confidential. Lawyers, especially big firm
lawyers, well understand the economic advantage of
published billing rates to create the impression that
revenues are routinely commensurate with hours billed
at published rates. Equally sophisticated clients —
especially corporate clients — well understand that
"it depends." For present purposes, it is enough to
note that published billing rates are of little aid to
a court in establishing the actual market for the
legal services provided here.

McDonough v. City of Quincy, 353 F. Supp. 2d 179, 187 (D. Mass.

2005).  Thus, here the Court finds unreasonable class counsel's

assertion that partners ought be compensated at the rate of $650

an hour.  The appropriate hourly rate for partners in this

particular case, this Court holds, is $350 per hour.  See Stokes

v. Saga Intern. Holidays, Ltd., 376 F. Supp. 2d 86, 93 (D. Mass.

2005) (Collings, M.J.) ($330 an hour is a reasonable fee for a

partner in a class action lawsuit).  Moreover, this number is

akin to the hourly rate awarded to civil rights attorneys -- a

professional endeavor with analogous complexity, workload, and

requisite skill levels.  See, e.g., E.E.O.C. v. AutoZone, Inc.,

934 F. Supp. 2d 342, 358-59 (D. Mass. 2013) (awarding fees for

lead counsel in civil rights case using hourly rate of $350).[32]

---

[32] "The burden of demonstrating the reasonableness of a
proposed hourly rate rests on the party requesting that rate."

The Court calculates the lodestar amount using an hourly rate of $350 for partners, as just determined appropriate, and using the provided rates for paralegals and the associates (whose rates the Court finds reasonable).  All told, the total number of hours spent on the case is 916.35, as discussed earlier.  See supra note 31.

| NAME | POSITION | HOURS | RATE | TOTAL |
|------|----------|-------|------|-------|
| Blankinship | Partner | 351.10 | $350 | $122,885.00 |
| Garber | Partner | 104.70 | $350 | $36,645.00 |
| Frei-Pearson | Partner | 77.70 | $350 | $27,195.00 |
| Carton[33] | Partner | 148.75 | $350 | $52,062.50 |
| Becker | Associate | 19.90 | $250 | $4,975.00 |
| Berg | Partner | 191.75 | $350 | $67,112.50 |
| Ronci | Paralegal | 12.05 | $90 | $1,084.50 |
| Burke | Paralegal | 3.60 | $90 | $324.00 |

E.E.O.C. v. AutoZone, Inc., 934 F. Supp. 2d 342, 356 (D. Mass. 2013) (citing Burke v. McDonald, 572 F.3d 51, 63 (1st Cir. 2009)).  Thus it suffices for this case to note that class counsel failed to persuade this Court that its proffered hourly rate was reasonable.  This Court notes, however, that there might be a response in future cases to its objection that published hourly rates are unhelpful in the absence of any data on actual "yield": Wolters Kluwer apparently publishes a commercial dataset of "actual rates that have been paid" by clients.  See Two Routes to Hourly Rates for Lawyers, Law 360 (April 15, 2015, 4:43PM EST), http://www.law360.com/articles/641797/2-routes-to-hourly-rates-for-lawyers (describing dataset).  Without expressing an opinion as to the quality of the report, or its relevance to any case in particular, the Court notes that it appears to bypass the main objection to published rates.

[33] Carton appears to have done work for both law firms.  See Meiselman Time Sheets (showing that Carton billed 70.00 hours); see also Carton Time Sheets (showing that Carton billed 78.75 hours).  The table above combined Carton's hours for a total of 148.75, as he proffered the same hourly rate of $650 at both firms.

[38]

| Benezra | Paralegal | 6.80 | $90 | $612.00 |
|---------|-----------|------|-----|---------|
|         |           | **916.35** |   | **$312,895.50** |

This yields a lodestar of $312,895.00 in attorneys' fees.[34]

Though Michaels has agreed to pay the requested amount were it ordered by the Court, the Defendant's assent does not render the amount reasonable.  Opponents, through their counsel, agree to settlements, including attorneys' fees, for a variety of reasons that are detached from the merits of the case and actual reasonableness.[35]  Thus, class counsel's argument that Michaels' assent to the requested amount reinforces its reasonableness does not persuade the Court.  See In re TJX Cos. Retail Sec. Breach Litig., 584 F. Supp. 2d 395, 399 (D. Mass. 2008) ("The acquiescence of the defendant . . . does not relieve this Court

---

[34] The Court awards the full lodestar amount, as it is based on a reasonable rate, and ignores class counsel's percentage reduction to its proposed lodestar amount in its request for attorneys' fees.

[35] For example, Howard M. Downs has explained that, even if there was an unmeritorious claim brought, defendants "might want to settle out as quickly as possible in order to avoid rising attorneys' fees and costs or to mitigate the potential negative impact of protracted litigation, such as bad press, poor public relations, and disruption of normal business activities." Howard M. Downs, Federal Class Actions: Diminished Protections for the Class and the Case for Reform, 73 Neb. L. Rev. 646, 687 (1994); see also Sylvia Lazos, Abuse in Plaintiff Class Action Settlements: The Need for a Guardian During Pretrial Settlement Negotiations, 84 Mich. L. Rev. 308, 312 (1985) (observing that defendants often settle to avoid the above mentioned costs and risks).

of its obligation to examine the fee request to ensure that the awarded fees are fair and reasonable.").

## IV.   CONCLUSION

Accordingly, this Court GRANTS IN PART class counsel's request for attorneys' fees and costs, ECF No. 74, and awards class counsel attorneys' fees in the amount of $312,895.00 and costs in the amount of $14,005.30.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE